UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

VEHICLE DEVELOPMENT CORPORATION
PTY LTD, an Australia Corporation and
VEHICLE DEVELOPMENT CORPORATION
PTE LTD, a Republic of Singapore
Corporation and as Assignee and
ATTORNEY-IN-FACT of VANTAGE
AUTOMOTIVE LIMITED, a Republic of
Singapore Corporation,

     Plaintiffs,

v.

LIVERNOIS VEHICLE DEVELOPMENT,
LLC, a Michigan limited liability company,

     Defendant,

and

COMERICA BANK

     Defendant/Counter-Plaintiff

v.

VEHICLE DEVELOPMENT CORPORATION
PTY LTD, an Australia Corporation and
VEHICLE DEVELOPMENT CORPORATION
PTE LTD, a Republic of Singapore
Corporation and as Assignee and
ATTORNEY-IN-FACT of VANTAGE
AUTOMOTIVE LIMITED, a Republic of
Singapore Corporation,

     Counter-Defendants.

Civil Case No. 13-14090

Hon. Terrence G. Berg

Hon. Michael J. Hluchaniuk

**FINDINGS OF FACT AND
CONCLUSIONS OF LAW**

This is a claim and delivery action, in which Plaintiffs/Counter-Defendants Vehicle Development Corporation PTY LTD ("VDC Aust") and Vehicle Development Corporation PTE LTD ("VDC Sing") (collectively, "VDC" or "Plaintiffs")[1] seek possession of 81 Ford F550 trucks (the "Trucks") from Defendant Livernois Vehicle Development, LLC ("Livernois").  Defendant/Counter-Plaintiff Comerica Bank ("Comerica") intervened in this lawsuit, as a secured creditor of Livernois (Dkt. 10).  The question presented is whether the Trucks should be returned to VDC or whether Comerica may take possession of the Trucks as collateral and sell them to help retire Livernois's debt.

The Court held a two-day bench trial on December 17 and18, 2013.  In light of the evidence presented at trial, and in consideration of the applicable law, the Court finds that the evidence was insufficient to establish that Comerica had a valid security interest in the Trucks.  Consequently, VDC is entitled to immediate possession of the Trucks.  Accordingly, the Court makes the following findings of fact and conclusions of law.

## FINDINGS OF FACT

Plaintiffs brought a claim and delivery action against Defendant Livernois (Dkt. 1).  The Complaint seeks the following relief: (1) a judgment awarding immediate possession of the Trucks and certain tooling to Plaintiffs; (2) an award of costs and attorneys' fees; and (3) such other relief that the Court finds just and

---

[1] VDC brings this action as an assignee of Vantage Automotive Limited ("VAL"), a Republic of Singapore Corporation.  VAL's role in this dispute is described in greater detail below.

1

equitable (Dkt. 1).  The parties stipulated that the 81 Trucks in the possession of Livernois have a combined value of $1.6 million (Tr., Dec. 17, 2013, at 7).

During the trial, Plaintiffs presented three witnesses: Ron Lee Kim Wah (Senior Manager of VAL), Miklos Kovatch (Production Manager of VDC), and Robert Peplowski (Safety Quality Coordinator of Livernois).  Comerica presented two witnesses: Harve Light (Senior VP of Comerica, Special Assets Group) and Norma Wallis (Owner of Livernois).

Plaintiff VDC Aust is an Australian corporation with its principal place of business in Australia (Compl., Dkt. 1, ¶ 1).  VDC Aust has experience in converting left-hand drive vehicles manufactured in the United States – including Ford F550 Trucks – to right-hand drive vehicles (Compl., Dkt. 1, ¶ 11; Kovatch Test., Tr. Dec. 17, 2013, at 41:2-6) for use in overseas markets.  Plaintiff VDC Sing is a wholly-owned subsidiary of VDC Aust, with its principal place of business in Singapore (Compl., Dkt. 1, ¶ 2).  VAL is a company incorporated in Singapore with its principal place of business in Singapore (Compl., Doc. # 1, ¶ 3).  Livernois is a Michigan limited liability company, with its principal place of business in Inkster, Michigan, that is licensed in Michigan to operate as a vehicle repair facility (P's Trial Ex. 49; Tr., Dec. 18, 2013, at 151:25-153:1).

VAL, a Singapore company, was awarded a contract by the Singapore Ministry of Defense to supply 186 right-hand drive ambulances, which were to be converted from left-hand drive Ford F550 trucks (Wah Test., Tr., Dec. 17, 2013, at

2

13:22-25, 14:15-18).  VDC Aust, VDC Sing, and VAL are parties to a May 2013 Supply Agreement (the "Supply Agreement") (Supply Agreement, P's Trial Ex. 1).

Comerica, a Texas banking association headquartered in Dallas, Texas and owned by Comerica, Inc., a Delaware corporation, is a lender to Livernois and has intervened in this lawsuit as a Defendant/Counter-Plaintiff, claiming that it has a security interest in the Trucks as collateral for the loans it extended to Livernois and related entities (Dkts. 10, 16, 17).

The Supply Agreement requires that the conversion work be performed in the United States (P's Trial Ex. 1).  VDC therefore subcontracted with Livernois to convert 186 Ford trucks, including the 81 Trucks in dispute in this litigation, from left-hand drive to right-hand drive (Wah Test., Tr., Dec. 17, 2013, 19:20; 20:3; Wallis Test., Tr., Dec. 18, 2013, at 121:21-25).  None of the 81 Trucks are titled in Michigan (Wah Test., Tr., Dec. 17, 2013, at 15:20-16:5).  The 81 Trucks have engines that burn mid-sulfur diesel fuel, preventing them from being sold or used in the United States (Wah Test., Tr., Dec. 17, 2013, at 15-16).  The Supply Agreement provides, among other things:

a. "Title to the [Trucks] shall remain with VAL at all times."  Supply Agreement, P's Trial Ex. 1, ¶ 18.1.

b. "VDC will be sub-contracting with Livernois to undertake the Conversion Work on the [Trucks] . . . ."  Id. at 1, ¶ E.

c. "Risk of loss or damage to each Vehicle shall be borne by VDC from the time when such [Truck] is received by VDC (or Livernois on behalf of VDC) from Ford Motor Company until such time when VAL has collected such [Truck] from Livernois' premises   . . . and VAL has confirmed acceptance of such [Truck]."  Id. at 17-18, ¶ 18.2.

3

VDC Aust and VDC Sing entered into a Manufacturing and Installation Agreement (the "Contract") with Livernois in May 2013 (P's Trial Ex. 3). The 186 Ford F550 Trucks purchased by VAL were delivered by Ford Motor Company to Livernois on or about December 19, 2012 (Wah Test., Tr., Dec. 17, 2013, at 19:8-15). Livernois was subcontracted to carry out a set of specific tasks to modify the Trucks from left-hand to right-hand drive (generally speaking, moving the steering wheel and column from one side of the cab to the other, and reconfiguring the instrument panel and related systems so that the Trucks function as right-hand drive vehicles). These tasks were defined in the Contract as the "Modification Work" (P's Trial Ex. 3; Wallis Test., Tr., Dec. 18, 2013, at 121:21-15).

"Modification Work" is defined as modifying the Vehicles in accordance with the Modification Specifications (P's Trial Ex. 3, at ¶ 2.1; Wah Test., Tr., Dec. 17, 2013, at 35:19-23). VDC agreed to pay Livernois $15,450 "per vehicle inclusive of all parts and labor" on a unit-by-unit basis for performing the Modification Work (P's Trial Ex. 3, at ¶ 4.1). The Contract also provided that:

> a. "Title to the [Trucks] shall at all times remain with VAL" (P's Trial Ex. 3 ¶ 3.1);
>
> b. "Livernois shall comply with all reasonable written directions which may be given by VDC of VAL concerning the storage of the [Trucks] at the Premises and written directions for the subsequent removal of the [Trucks] from the Premises. In the event of any inconsistency between the directions given by VAL or VDC the directions given by VAL shall prevail;" *Id* ¶ 3.2.
>
> c. "Livernois shall not in any circumstances assert a lien over the [Trucks]." *Id* ¶ 3.3.

4

Of the 186 Vehicles purchased by VAL, 105 of them have been converted to right-hand drive by Livernois and delivered to Singapore (JFPO, [Doc. # 60], at 9; P's Trial Br., [Doc. # 61], at 11).  VDC paid Livernois in full for the 105 delivered Trucks, at $15,450 for each Truck (Kovatch Test., Tr., Dec. 17, 2013, at 68:6-9).

Experiencing severe financial difficulties, Livernois ceased all Modification Work on or about August 2, 2013 (JFPO, [Doc. # 60], at 4, 9).  On September 9, 2013, VDC officially notified Livernois that it was terminating the Contract pursuant to ¶ 8.2 (the "Termination Notice") (P's Trial Ex. 4).  VDC demanded that Livernois immediately return all Trucks and other property (described more fully below) in its possession.  *See id*.  Livernois is engaged in an orderly wind-down of business (Light Test., Tr. Dec. 18, 2013, at 23:13-15).  According to the testimony presented at trial, the 81 Trucks fall into the following categories regarding their stage in the modification process:

a. 56 Trucks on which Livernois performed no Modification Work (Wallis Test., Tr., Dec. 18, 2013, at 90:25-91:14);

b. 19 Trucks on which Livernois performed some amount of Modification Work (estimating 10-95%) (Wallis Test., Tr., Dec. 18, 2013, at 91:15-18);

c. 5 Trucks that Livernois says are completed, although VDC disputes that these Trucks were modified according to the Modification Specifications[2] (Wallis Test., Tr., Dec. 18, 2013, at 91:19-93:7); and

d. 1 Truck (which is also known as "Pilot 2"), that was being used by Livernois as the template for its conversion work.  VDC has already paid in full for Pilot 2.

---

[2] The Court makes no finding as to whether these 5 Trucks were "completed," because such a finding is unnecessary to reach a decision in this matter.  Additionally, Ms. Wallis conceded that Livernois is not due any payment under the Contract from VDC (Wallis Test., Tr., Dec. 18, 2013, at 95:2-6).

5

(P's Trial Exs. 15, 45; Kovatch Test., Tr., Dec. 17, 2013, at 67:24-68:15; Wallis Test., Tr., Dec. 18, 2013, at 90:25-93: 7).

In addition to the Trucks, Plaintiffs seek the recovery of certain additional property, including manufacturing tooling (the "Tooling"), CAD drawings, templates, etc. (collectively, the "Property") owned by VDC and used by Livernois in the course of modifying the Trucks (JFPO, [Doc. # 60], at 2-3). VDC paid for and owns the Tooling in full (Kovatch Test., Tr., Dec. 17, 2013, at 92:2-3,5-6). Comerica claims no interest in the Tooling or Property (Light Test., Tr., Dec. 18, 2013, at 34:22-35:5; Wallis Test., Tr., Dec. 18, 2013, at 109:23-110:5).

On November 20, 2013, Livernois agreed to return VDC's Property (JFPO, [Dkt. 60], at 3). Some of the Property has been returned. *See id*. There are fourteen pieces of Property that Livernois has failed to return to VDC (Kovatch Test., Tr., Dec. 17, 2013, at 96:6-17; P's Trial Ex. 46). VDC reserved the right to seek damages based on Livernois's wrongful retention of the Property. *See id*. The evidence presented at trial established that the replacement cost for the missing Property is $24,200.97 (Kovatch Test., Tr., Dec. 17, 2013, at 92:13-25, 93:1-9).

Livernois is in default of various promissory notes to Comerica. In addition to borrowing in its own name, Livernois guaranteed the indebtedness of two related entities with which it shares common ownership, NoToDa, LLC ("NoToDa") and NTD Investments, LLC ("NTD"), which also received loans from Comerica (D's Trial Ex. 202(a), (b), (e), (f); Light Test., Tr., Dec. 18, 2013, at 10). Livernois's guarantees

6

provide that Livernois "unconditionally and absolutely guarantee(s) to Comerica Bank … all existing and future indebtedness … to the Bank" of NTD and NoToDa (D's Trial Ex. 202(a), (c), (e)).  Livernois, NoToDa, and NTD each executed promissory notes in favor of Comerica (D's Trial Exs. 201(a)–(f)).  The promissory notes evidence the indebtedness of Livernois, NoToDa, and NTD to Comerica.  *Id.* The promissory notes have matured, but have not been repaid in full (Light Test., Tr. Dec. 18, 2013 at 11-16).  Livernois, NoToDa, and NTD are in default of their obligations to Comerica (Light Test., Tr., Dec. 18, 2013, at 11, 41).

The outstanding principal and interest due to Comerica under the promissory notes executed by Livernois, NoToDa, and NTD, as of December 10, 2013, totaled $3,134,611.20 (D's Trial Ex. 203; Light Test., Tr. Dec. 18, 2013, at 20, 24).[3]  The amount due Comerica under those promissory notes did not change between December 10 and December 18, 2013 (Light Test., Tr., Dec. 18, 2013, at 24). Livernois granted Comerica an all-assets security interest as security for repayment of the debts of Livernois (D's Trial Ex. 204).  Comerica perfected its security interest by filing a UCC-1 financing statement (Dkt. 21, Ex. D pp 4-7).  Neither VDC nor

---

[3]     More particularly, Livernois's indebtedness to Comerica was $7.81; NoToDa's was $1,951.771.66; and NTD's was $1,182,831.73 (Light Test. Tr., Dec. 18, 2018, at 21-22; D's Trial Ex. 203).  NoToDa and NTD are real estate holding companies; the loans to these companies are secured by mortgages of commercial property in Inkster, Michigan.  The real estate owned by NTD was appraised to be worth $900,000, and the real estate owned by NoToDa was appraised to be worth $2,000,000 (Light Test., Tr., Dec. 18, 2013 at 38-39).  Comerica has not foreclosed on the mortgages encumbering this real estate, but the properties are currently listed for sale.  *Id.* at 41.  Ms. Wallis also personally guaranteed the Comerica loans.  *Id.* at 43.  Comerica estimates that Ms. Wallis, and certain trusts controlled by her, are collectible for "as much as a million dollars."  *Id.* at 45. Comerica entered into a forbearance agreement that protects Ms. Wallis and Livernois from collection efforts until Livernois "gets its affairs in order… [Comerica has] agreed to loan [Livernois] additional funds in order to get through that process"  *Id.* at 44.  Nevertheless, the record shows that the properties and assets of NoToDa, NTD, and Ms. Wallis have sufficient value to retire Livernois's remaining debt of $3.1 million, without including the value of the Trucks.

VAL filed a UCC-1 financing statement with respect to the Trucks (D's Trial Exs. 205, 206). VDC did, however, file a UCC-1 financing statement with respect to the Tooling and Property (D's Trial Ex. 206).

## CONCLUSIONS OF LAW

The Court has subject matter jurisdiction under 28 U.S.C. § 1332, because there is complete diversity of citizenship between the parties and the amount in controversy, exclusive of interests and costs, exceeds $75,000 (Compl., [Dkt. 1], at ¶ 6; JFPO, [Dkt. 60], at 1). Venue is proper in this district. *See id.*

VDC brings this lawsuit under Federal Rule of Civil Procedure 64, Michigan Court Rule 3.105, and Michigan Compiled Laws § 600.2920. Rule 64 provides, in pertinent part, that "throughout an action, every remedy is available that, under the law of the state where the court is located, provides for seizing a person or property to secure satisfaction of the potential judgment." Thus, the Court will apply the standards and procedures set forth in Michigan Court Rule 3.105, which provides, in pertinent part:

> **(C) Complaint; Joinder of Claims; Interim Payments.** A claim and delivery complaint must:
>
> (1) specifically describe the property claimed;
>
> (2) state the value of the property claimed (which will be used only to set the amount of bond and not as an admission of value);
>
> ***
>
> **(H) Judgment.**
>
> (1) The judgment must determine

8

(a) the party entitled to possession of the property,

(b) the value of the property,

(c) the amount of any unpaid debt, and

(d) any damages to be awarded.

(2) If the property is not in the possession of the party who is entitled to possession, a judgment must order the property to be immediately delivered to that party.

(3) If the action is tried on the merits, the value of the property and the damages are determined by the trier of fact.

At the outset of this case, VDC filed a motion for immediate possession of the Trucks (Dkt. 2), which the Court denied on November 27, 2013 (Dkt. 46). The Court did, however, require Livernois and Comerica to post a bond for $3,200,000 (representing twice the value of the Trucks, as stated in the Complaint) to protect against any physical damage, destruction, concealment or disposition of the Trucks (Dkt. 46). Livernois and Comerica did post such a bond (Dkt. 49). At trial, only VDC and Comerica advanced claims to possession of the Trucks. VDC, as an assignee and attorney-in fact for VAL, asserts an ownership interest in the Trucks.

Comerica, as a secured lender to Livernois, seeks to enforce a security interest in the Trucks. To prove its security interest, Comerica must establish by a preponderance of the evidence that: (1) Livernois executed a security agreement that describes the Trucks; (2) Comerica gave value for its rights; and (3) Livernois has "rights in the [Trucks]." MCL §440.9203(2)(a)-(c). In light of the evidence presented at trial, the Court finds that Comerica has not established by a preponderance of evidence all of the elements that it must prove to demonstrate

9

that it had a security interest in the Trucks.  The Court will discuss each element that must be proven:

1.   *Did the Security Agreements Describe the Trucks as Collateral?*

Livernois and Comerica signed several Security Agreements granting Comerica security interests.[4]  None of the Security Agreements specifically describe the Trucks as collateral, but rather describe general categories of collateral, such as "all Accounts Receivable," "all Inventory," and "all Equipment and Fixtures."  The Security Agreements were signed by Livernois, NTD, and NoToDa in the years 2003 and 2006.  According to the testimony of Livernois's owner, Norma Wallis, Livernois operated primarily as a repair facility when the Security Agreements were signed, and was licensed as such (Wallis Test., Tr., Dec. 18, 2013, at 98).  Livernois was not in the business of drive system conversion work until 2012 (Wallis Test., Tr., Dec. 18, 2013, at 105-106).  Although Ms. Wallis had been interested in getting additional financing from Comerica based on its conversion work for VDC, Comerica would not advance any additional loans based on the Contract between Livernois and VDC, because Comerica considered the Contract a "foreign receivable" (Wallis Test., Tr., Dec. 18, 2013, at 147-48).

To carry its burden of showing that the Trucks are described in the Security Agreements, Comerica relies on the language in the Security Agreements stating

---

[4] A Security Agreement dated April 6, 2005, between Livernois and Comerica (D's Trial Ex. 204a); a Security Agreement dated March 24, 2003, between Livernois and Comerica to secure the indebtedness of NTD (D's Trial Ex. 204b); and an "Amendment" dated October 3, 2006 to the March 24, 2003 security agreement that names NoToDa as an additional "Borrower" (D's Trial Ex. 204c).

10

that the collateral includes "all assets" of the debtor, including all "Inventory" and "Equipment and Fixtures" (D's Trial Ex. 204a at ¶1). Comerica takes the position that the Trucks are in fact described in the Security Agreements because the Agreements cover "inventory" and "equipment" and the Trucks fall within the statutory definitions for those terms. These terms are defined in Michigan's statutory codification of the Uniform Commercial Code ("UCC"). *See* MCL § 440.9102 (uu) and (gg). In light of the evidence presented at trial, the Court finds that the Trucks do not meet the statutory definitions of either "inventory"[5] or "equipment."[6]

The statute defines inventory as goods "leased by a person as a lessor"; "held by a person for sale or lease or to be furnished under a contract of service"; "furnished by a person under a contract of service"; or consisting of "raw materials, work in process, or materials used or consumed in a business." The evidence demonstrated that the Trucks were owned by VAL and were temporarily in the possession of Livernois only for a series of tasks to be completed. The Trucks were

---

[5]     MCL § 440.9102 defines "inventory" as:

   (uu) . . . goods, . . . that. . . :

   *(i)*     Are leased by a person as lessor.

   *(ii)*    Are held by a person for sale or lease or to be furnished under a contract of service.

   *(iii)*   Are furnished by a person under a contract of service.

   *(iv)*    Consist of raw materials, work in process, or materials used or consumed in a business.

[6]     MCL § 440.9102(gg) defines "equipment" as: "goods other than inventory, farm products, or consumer goods."

not goods being held for sale or lease by Livernois in the ordinary course of

business, as Ms. Wallis admitted (Wallis Test., Tr., Dec. 18, 2013, at 100:11-21).

Comment 4 to Michigan Compiled Laws § 440.9102 makes it clear that the Trucks

also do not fit the inventory category of "raw materials, work in process or materials

used or consumed in a business."[7]  Those terms cover materials that are not held for

sale or lease but are the kinds of materials that are "used up or consumed in a short

period of time in producing a product or providing a service."[8]  *See, e.g., First*

*Colorado Bank & Trust, N.A. v. Plantation Inn, Ltd.*, 767 P.2d 812, 814 (Colo. Ct.

App. 1988) (goods "not consumed in the production of an end product" do not

constitute "inventory").  Here, the Trucks were not "used up or consumed" during

the conversion process.  The Trucks arrived as functional Ford F550s and the

---

[7]      **Error! Main Document Only.**The "Official Comments" that accompany the Uniform
Commercial Code provide interpretative support to aid courts in determining the purpose of a
certain code section.  Even though the comments do not carry the weight of a legislative enactment
and are not binding, courts often give substantial consideration to them when analyzing the
particular code section at issue when the need arises for determining the intent of the legislature in
enacting the code section.  *See In re Brace*, 163 B.R. 274 (Bankr. W.D. Pa. 1994); *In re Taylor*, 45 B.R.
643 (Bankr. M.D. Pa. 1985*); In re Bristol Associates, Inc.*, 505 F.2d 1056 (3d Cir. 1974).

[8]      Comment 4 to MCL § 440.9102 expounds on the difference between inventory and equipment
as follows:

> Goods are inventory if they are leased by a lessor or held by a person for sale or lease.
> The revised definition of "inventory" makes clear that the term includes goods leased
> by the debtor to others as well as goods held for lease. (The same result should have
> obtained under the former definition.) Goods to be furnished or furnished under a
> service contract, raw materials, and work in process also are inventory. Implicit in
> the definition is the criterion that the sales or leases are or will be in the ordinary
> course of business. For example, machinery used in manufacturing is equipment, not
> inventory, even though it is the policy of the debtor to sell machinery when it
> becomes obsolete or worn. Inventory also includes goods that are consumed in a
> business (e.g., fuel used in operations). In general, goods used in a business are
> equipment if they are fixed assets or have, as identifiable units, a relatively long
> period of use, but are inventory, even though not held for sale or lease, if they are
> used up or consumed in a short period of time in producing a product or providing a
> service.

conversion process did not cause them to be "consumed" or "used up" as raw materials or component parts might be during a production process.

The evidence also did not demonstrate that the Trucks fit the definition of "equipment." Under Comment 4 to Michigan Compiled Laws § 440.9102, "equipment" is intended to include "machinery used in manufacturing," and "fixed assets that have a long period of use." Although the term "equipment" is broadly defined as any "goods other than inventory, farm products or consumer goods," the only "goods" covered in this definition are those "things that are movable *when a security interest attaches*." MCL § 440.9102qq (emphasis added). Consequently, if no security interest attached to the Trucks, as is the case if the debtor had no rights in the Trucks, then the Trucks do not fall within the definition of "goods" and cannot be swept into the catch-all definition of "equipment" as any goods other than inventory, farm products of consumer goods.

In addition to the difficulties the Court finds in fitting the Trucks under the UCC's definitions of inventory and equipment, the evidence presented at trial cast doubt on whether either Comerica or Livernois understood or intended the Trucks to serve as collateral to secure financing under the Security Agreements. For example, Ms. Wallis testified that she recalled receiving an e-mail dated August 14, 2013, from her Chief Operating Officer, Mr. Doug Goad, which stated that "[i]t has been well documented and well known by VDC that LVD [Livernois] cannot borrow against any of the invoicing, receivables, production work in process (WIP) or the parts WIP" (Wallis Test., Tr., Dec. 18, 2013 at 89:7-25). Comerica's Senior Vice

13

President in the Special Assets Group, Mr. Harve Light testified at trial that approximately 11 days after VDC had demanded that Livernois return the Trucks, on September 20, 2013, he had met with Ms. Wallis to address this situation, but at that point "[i]t was unclear whether or not [Comerica] had a security interest in [the Trucks]" (Light Test., Tr., Dec. 18, 2013, at 63).

Finally, the testimony at trial included proof that some 300 to 400 other vehicles, owned by the Chrysler Corporation, were also in the possession of Livernois at the time it ceased operations (in or about August 2013) under an on-going repair contract Livernois had with Chrysler, but neither Comerica nor Livernois considered these vehicles to be collateral under the Security Agreements (Wallis Test., Tr., Dec. 18, 2013, at 129-33; Light Test., Tr., Dec. 18, 2013, at 49; 75-77). Testimony established that Comerica took no action to treat these vehicles as either inventory or equipment under its security agreements with Livernois (Light Test., Tr., Dec. 18, 2013, at 49), and Ms. Wallis did not consider these Chrysler vehicles to be collateral either (Wallis Test., Tr., Dec. 18, 2013, at 133-34). Comerica negotiated with Chrysler and accepted a payment for accounts receivable owed by Chrysler to Livernois because Comerica had not evaluated whether it had a valid security interest in the Chrysler vehicles (Light Test., Tr., Dec. 18, 2013 at 75-77). Indeed, Mr. Light, Comerica's representative, testified that, "[a]t that time, I had no reason to believe that we had a security interest in the Chrysler vehicles." *Id.*

14

Where the bank's witness has testified that: (1) as of September 2013, he was not certain whether the bank had a security interest in the Trucks owned by VAL (but then in Livernois's possession for Modification Work); and (2) as of August 2013, he did not believe Comerica had a security interest in some 300 to 400 other vehicles owned by Chrysler Corporation (but then in Livernois's possession for repair work), this evidence does not support a conclusion that vehicles on Livernois's premises for repair or conversion work were then considered by the lender or the debtor to be collateral described in the Security Agreements.

Based on the foregoing the Court concludes that: (1) the Trucks do not fit within the statutory definitions of "inventory" or "equipment," and therefore the Security Agreements' inclusion of these general terms does not adequately describe the Trucks as collateral; and (2) the evidence presented at trial cast doubt on whether the debtor or the lender considered the Trucks to be collateral as described in the Security Agreements.  Therefore the Court concludes that this element has not been proven by Comerica by a preponderance of the evidence.

### 2.    *Did Comerica Give Value for its Rights?*

The evidence established that Comerica gave value to Livernois, by lending money to Livernois and related entities (Light Test., Tr., Dec. 18, 2013, at 10, 14-16; D's Trial Ex. 204).  As suggested by the discussion above, however, there is some doubt as to whether the value given by Comerica was intended to be secured by any of the work on the VDC project.  In fact, Comerica explicitly told Ms. Wallis that Comerica did not and would not consider the VDC project as part of Livernois'

15

borrowing base (Wallis Test., Tr., Dec. 18, 2013, at 147:18-148:14), and specifically declined to loan Livernois any additional funds based on this "foreign receivable." Neither party disputes the fact that Comerica "gave value" when it loaned funds to Livernois and its related entities.  The parties did not extensively brief or argue the question whether Comerica's unwillingness to lend to Livernois based on the VDC project undermines Comerica's position that when it "gave value," it did so in exchange for a security interest in the VDC Trucks.  Because the Court finds that Comerica's security interest fails on other grounds – the Court declines to opine on whether Comerica meets this factor.

### 3.   Does Livernois Have Rights in the Trucks?

The third element that must be proven in order to establish a security interest is that the debtor had "rights in the collateral."  The evidence presented at trial did not establish by a preponderance that Livernois had sufficient "rights in the Trucks" to permit a security interest to attach.

Comment 6 to Michigan Compiled Laws § 440.9203 recognizes that "[a] debtor's limited rights in collateral, short of full ownership, are sufficient for a security interest to attach. However, in accordance with basic personal property conveyancing principles, the baseline rule is that a security interest attaches only to *whatever rights a debtor may have*, broad or limited as those rights may be" (emphasis added).  A security interest does not attach to a particular asset; rather, it attaches to the debtor's rights in a particular asset.  *See First National Bank of*

16

*Philip v. Temple*, 642 N.W.2d 197, 204 (S.D. 2002). The Court must then determine what rights Livernois had in the Trucks.

The primary cases relied on by Comerica arise in the manufacturing context, where the question is whether a manufacturer who has received (but does not own) components or raw materials to be transformed into a finished product for sale has rights to those components or raw materials that would allow a security interest to attach. The parties each point the Court to cases from the Michigan Court of Appeals and from the Minnesota Supreme Court – *Litwiller* and *Vidmar*. Unlike the debtors in *Litwiller* and *Vidmar*, the Court finds that Livernois does not have any "contract rights to the goods." *Litwiller Machine & Mfg., Inc. v. NBD Alpena Bank*, 457 N.W.2d 165 (Mich. Ct. App. 1990); *State Bank of Young Am. v. Vidmar Iron Works, Inc.*, 292 N.W.2d 244, 250 (Minn. 1980).

The Court applies Michigan law in determining whether Livernois has sufficient rights in the Trucks to allow a security interest to attach. In *Litwiller Machine & Mfg., Inc. v. NBD Alpena Bank*, 457 N.W.2d 165 (Mich. Ct. App. 1990), two steel fabrication companies entered into an agreement by which Litwiller purchased steel components and had them delivered to Koss, a manufacturer of "boom assemblies." *See* 457 N.W.2d at 164. In turn, Koss used the steel components purchased by Litwiller, incorporating them into boom assemblies that were to be sold to the government. Koss defaulted on its loan with its bank before the work was complete. The bank asserted a security interest in the component

17

parts as inventory.  *Id*.  The *Litwiller* court held that Koss had sufficient rights in the steel components for the security interest to attach for several reasons.

First, the *Litwiller* court looked to the reasoning of an Oklahoma case, *Morton Booth Co. v. Tiara Furniture, Inc.*, 564 P.2d 210 (Okla. 1977).  *Morton Booth* also arose in a manufacturing setting.  In that case, Booth supplied various components for making gun cabinets to Tiara, who would use the parts along with its own lumber to manufacture the gun cabinets into a finished product and sell it to Booth.  The question in *Morton Booth* was whether Tiara had sufficient rights in the parts supplied by Booth so that a security interest would attach.  The Court in *Morton Booth* recognized that a security interest could *not* attach to any rights created under a bailment, but it found that as long as a debtor had possession of property under an agreement that created an interest greater than naked possession, it then had rights in the property to which a security interest could attach.  *See Morton Booth* at 214.  The *Morton Booth* court considered the following rights to be sufficiently greater than mere possession to allow a security interest to attach:  (1) the right to incorporate the materials into a product for sale; (2) the right to use the materials; and (3) the right to sell the finished product to Booth.  *Id.*

Applying this reasoning from *Litwiller* and *Morton Booth* to the case at bar, and considering the evidence presented at trial, Livernois did not have rights to the Trucks that were comparable to those that Tiara had in the gun cabinet components, or that Koss had in the boom assembly components.  Livernois was not authorized to incorporate the Trucks into some other finished product for sale (it

18

was obliged to make specific changes to each Truck, which were not for sale);
Livernois did not have the rights to use the Trucks in the sense that a manufacturer
"uses up" component parts in assembling a new product (it was obliged to preserve
each Truck and convert its steering column and related systems, not to "use" it in
manufacturing a completely new product); and, finally, Livernois had no right
whatsoever to sell the Trucks as finished products.

The *Litwiller* court also relied on *State Bank of Young Am. v. Vidmar Iron
Works, Inc.*, 292 N.W.2d 244, 250 (Minn. 1980).  Like *Morton Booth*, *Vidmar* arose
in the manufacturing context and involved a metal shop's supplying raw materials
to another shop (Adaptable) to do its overflow fabricating work.  The *Vidmar* court
concluded that Adaptable, the overflow fabricator, had sufficient rights in the raw
materials to allow a security interest to attach – even though they were supplied by
Vidmar – for two reasons:  (1) it had "contract rights in the goods to the extent of
the amount due for its work;" and (2) it "had a statutory mechanic's lien in the
goods to secure it."  *Litwiller* 457 N.W.2d at 166 (summarizing *Vidmar*).

The reasons the *Vidmar* court found sufficient to allow a security interest to
attach to the raw materials in that case are not present in this case.  Livernois
conceded at trial that, under the Contract, it was not due any payment for its work
and the Contract itself expressly prohibited Livernois from asserting any lien in the
Trucks (P's Trial Ex. 3, Contract ¶ 3.3; Wallis Test., Tr., Dec. 18, 2013, at 95:2-6).
The facts presented at trial do not show that Livernois had the kinds of rights in the
Trucks that the *Vidmar* court found Adaptable had in the raw materials so as to

19

allow a security interest to attach.  The rights that Adaptable had in the raw materials (contract rights for payment due and the right to impose a lien to enforce such contract rights) are not rights enjoyed by Livernois, according to the evidence presented at trial.

Finally, the *Litwiller* court relied on a Tenth Circuit decision, *Kinetics Technology International Corp. v. Fourth National Bank of Tulsa*, 705 F.2d 396 (10th Cir. 1983).  Also in a manufacturing setting, the Tenth Circuit found sufficient rights in the collateral where a manufacturer was using some parts from KTI and some of its own parts, to build furnace economizers that it sold to KTI.  *Id.* at 397. In addition to relying on the reasoning of *Morton Booth*, the Tenth Circuit pointed out that by supplying materials to a manufacturer in advance, KTI was acting like a financier, similar to the bank.  *Id.* at 399.  It therefore made sense to treat "buyer-lenders" – such as KTI – as a lender, and to hold it responsible for filing a UCC financing statement to protect its interest in the parts against other lenders.  In the case at bar, VDC did not supply raw materials to Livernois in the manner of a lender of components; it was not financing Livernois's operations the way that KTI was financing the operations of the manufacturer to whom it provided specially designed parts.  Consequently, as with *Morton Booth*, and *Vidmar*, the reasoning of the *Kinetics* case does not support a finding that Livernois had sufficient rights in the Trucks to allow Comerica's security interest to attach.

In summary, both in *Litwiller* and in *Vidmar*, the courts held that the respective debtors "had contract rights to the goods to the extent of the amount due

for its work," which were secured by a statutory right to assert a lien for that work. *Litwiller*, 457 N.W.2d at 167; *Vidmar*, 292 N.W.2d at 250.  In this case, Livernois concedes that it has no claim for "amounts due for its work," and the contract itself prohibits Livernois from asserting a lien over the Trucks as security for that claim (P's Trial Ex. 3, Contract ¶ 3.3; Wallis Test., Tr., Dec. 18, 2013 at 95:2-6).

In *Vidmar*, which has been adopted by the Michigan courts in *Litwiller*, a "secured party only gets rights in the goods to the extent of the debtor's rights in them." *Vidmar*, 292 N.W.2d at 250 (quoting 1 G. Gilmore, Security Interests in Personal Property, § 11.5 at 353 (1965)) ("[T]he secured party will get whatever rights the debtor had.")). *Litwiller* held that the debtor only "had contract rights to the goods to the extent of the amount due for its work . . . ." *Id.* at 377.  Here, the debtor, Livernois, has rights determined by the Contract.  Under the Contract, Livernois has no right to retain possession and no ownership interest in the Trucks (P's Trial Ex. 3, Contract ¶ 3.1).  Livernois also has no statutory right to retain possession in the Trucks because Livernois expressly agreed that it would never "in any circumstances assert a lien" over the Trucks (P's Trial Ex. 3, Contract ¶ 3.3).

In an unpublished opinion, the Sixth Circuit applied reasoning that is more applicable to the facts of this case than the *Litwiller* and *Vidmar* cases.  In *GMAC Bus. Credit, L.L.C. v. Ford Motor Co.* the Sixth Circuit addressed Ford's argument that raw materials (steel) it had supplied to a parts manufacturer were held under a bailment, and that therefore the lender's security interest should not attach.  *See GMAC Bus. Credit, L.L.C. v. Ford Motor Co.*, 100 F. App'x 404, 407-08 (6th Cir.

21

2004).  The Court of Appeals recognized that, under Michigan law, "'bailment'

imports the delivery of personal property by one person to another in trust *for a*

*specific purpose,* with a contract, express or implied, that the trust shall be

faithfully executed and the property returned or duly accounted for when the

special purpose is accomplished."  *Id.* at 408 (emphasis in original).  The Sixth

Circuit opined:  "[a]lthough we agree that a "'special purpose' *could be more than*

*mere possession*, we do not believe that 'transformation of an item' could be a

'special purpose.'"  *Id.*  (emphasis added).  Recognizing the problems with finding a

bailment on the facts before it, the Court explained:

> Ford has been unable to point to any Michigan cases that would
> support their theory that when a raw material is provided by one party
> to the other for creation of a wholly new product, the raw material is
> considered a 'bailed item.'  On the contrary, the classic case of a
> bailment that involves more than mere possession is loaning an item of
> personal property, such as an automobile, for the use by the bailee."
> *Id.*, quoting *Godfrey v. City of Flint,* 279 N.W. 516, 517 (Mich. 1938)
> (defining bailment as giving "to another the *temporary use and*
> *possession of property* ... the latter agreeing to return *the same* at a
> future time.") (quoting 8 C.J.S. Bailments, p. 243, § 8).

*GMAC Bus. Credit, L.L.C. v. Ford Motor Co.*, 100 F. App'x 404, 408-09 (6th Cir.

2004).

   *GMAC Business Credit, L.L.C. v. Ford Motor Co.* expresses the Sixth Circuit's

approval of the view that Michigan law recognizes that a bailment may be for a

special purpose – and that such a special purpose "could be more than mere

possession" – but that transformation of raw materials into *wholly new product*

would not fall within such a special purpose.  In the case at bar, Livernois's

temporary possession of the Trucks to convert them to right-hand drive vehicles qualifies as a bailment for a special purpose of the kind approved by the Sixth Circuit because, unlike in the *GMAC* case, changing the drive mechanism clearly does not transform the truck into an entirely new product.  Unlike transforming raw steel into a new auto part, converting a cab to right-hand drive does not create an entirely new truck.  A bailment for a special purpose, such as the Sixth Circuit recognized, would not create rights in the bailed item sufficient to allow a security interest to attach.

Livernois received possession of fully-operational Trucks under a contract to convert their drive mechanism; it was not taking control of raw materials and transforming them into wholly new products for sale.  VDC was not financing the manufacturing of any Trucks.  Rather, VAL had fully-operational Trucks shipped directly from Ford to Livernois, so that Livernois could perform Modification Work. Livernois had no right to sell the Trucks at any point in the process.  The limited purpose for which Plaintiffs' entrusted Livernois with temporary possession of the Trucks simply does not rise to the level of "rights in the [Trucks]" sufficient to allow Comerica's security interest to attach to all the Trucks.

The Court recognizes that the Modification Work to be performed on the Trucks was significant, involving many steps; nonetheless, the evidence before the Court demonstrates that this situation is more akin to bringing a number of vehicles into a garage for extensive repairs, than it is to shipping incomplete parts or raw components to a manufacturer to be transformed into a totally new product

23

for sale.  In light of the particular facts of this case, the Court finds that Livernois

held the Trucks under a bailment for a special purpose.[9]  The UCC is inapplicable to

a bailment, and is inapplicable here.  *See In re Wolverine Fire Apparatus Co. of

Sherwood Mich.*, 465 B.R. 808, 819 (Bankr.E.D. Wis. 2012).  "[I]f a debtor takes

possession of property for the limited purpose of repairing it, the debtor's rights in

the collateral are those of a mere bailee, and an inventory lender has no security

interest in the property." 1 Barkley Clark & Barbara Clark, The Law of Secured

---

[9]  An examination of the definitions for "bailments" found in treatises reveals examples similar to the case at bar.

> A bailment occurs when property is entrusted to a party temporarily for some purpose and then to be later returned to the person who delivered it, such as delivery of a watch to be repaired. There is no intention of creating any property interest in the recipient. The party delivering the property relinquishes possession but retains ownership of the property. Ordinarily, debtors that hold property pursuant to a bailment do not have sufficient rights in the collateral to permit attachment of a security interest.

2 L of Purchasing § 27:5 (2d ed.).

> The term "bailment" in its ordinary legal sense signifies a contract resulting from delivery of a thing by the bailor to the bailee on condition that it be restored to the bailor in accordance with his or her directions as soon as the purpose for which it was bailed is satisfied.

8 C.J.S. Bailments § 1

> In addition, a bailment may be established where an object is delivered to another so the recipient may perform certain work on it. The deposit of a commodity for handling, processing, reconditioning, or shipment is a bailment. Accordingly, a bailment results from the delivery of personal property to another for a specific purpose such as repairs. Transactions included in the law of bailment include a bailment of incomplete goods for the purpose of having the bailee manufacturer (sic), repair, or otherwise improve them. Similarly, a bailment may be created where an article is delivered to another for the purpose of performing certain services by means of, or connected with, it. Where the owner of a chattel delivers it to another to perform work in respect to or by means of it, the relationship of the parties is that of bailor and bailee where the owner parts with control over the chattel and is that of master and servant where the owner retains control thereof.

8 C.J.S. Bailments § 4 (citations omitted).

Transactions under the Uniform Commercial Code ¶ 2.04[1] at 2.50 (re. 11/09); *see also In re Bristol Indus. Corp.*, 690 F.2d 26, 30-31 (2nd Cir. 1982) (Mansfield, J., concurring) (finding "persuasive evidence that the parties intended to and did create a bailment"). Mere possession of the Trucks by Livernois is not sufficient to support an attachment. *See, e.g., Pleasant View Farms, Inc. v. Ness*, 455 N.W.2d 602, 604 (S.D. 1990) ("security interest will attach to the collateral only to the extent of the debtor's rights in the collateral").

In sum, a security interest attaches to whatever rights that a debtor has in the collateral. A possessory interest for such a limited purpose as converting the drive configuration of a truck does not create rights in the collateral where the debtor had no rights to payment due, no lien rights, and no rights to transform the trucks into wholly new products for sale. In general, the true owner (VAL) must authorize the debtor to encumber the property for a valid security interest to attach. Such authority was expressly denied to Livernois under the Contract. Since Livernois had no ownership rights in the collateral, but was in possession of the Trucks only for the limited purpose of modifying the Trucks, Comerica's security interest never attached to the Trucks. *See, Matter of Chicago, Madison & Northern Ry. Co.*, 36 B.R. 292 (Bankr. W.D. Wis. 1984).[10]

---

[10] Furthermore, as discussed above under the issue of whether the security agreement described the Trucks, the Court must weigh the evidence that Livernois had some 300 Chrysler vehicles on its premises at the time it ceased operations (Wallis Test., Tr., Dec. 18, 2013, at 95:2-6), but Comerica did not believe it had any rights in those vehicles to cause a security interest to attach (Light Test., Tr., Dec. 18, 2013 at 77:9-10). The bank's treatment of the Chrysler vehicles as property in which it had no security interest is a fact that the Court weighs in favor of the conclusion that the Trucks should be treated likewise.

*4. Damages*

Finally, the Court must determine the appropriate amount of monetary damages arising from Livernois's detention of the Trucks and for the lost Property. "[A] civil action for 'claim and delivery' may be brought to recover possession of any goods or chattels that have been unlawfully taken or unlawfully detained and to recover damages attendant to the unlawful taking or detention." *Lewis v. First Alliance Mortgage Co.*, Case No. 230089, 2004 WL 1365997 (Mich. Ct. App. June 17, 2004). In this matter, the Court finds that the proper measure of damages is the *physical* deterioration of the Trucks from the time Plaintiffs terminated the contract with Livernois and demanded possession of the Trucks (September 9, 2013) to the present. Also, Plaintiffs are entitled to recover damages for any Property that was lost or destroyed by Livernois.

As to physical damages to the Trucks, Plaintiffs' counsel asked Mr. Kovatch about "deterioration that can occur over a three-month time period to vehicles" and about the "types of problems [that] can occur when a vehicle sits idle over a three-month period" (Kovatch Test., Tr., Dec. 17, 2013, at 97). Mr. Kovatch provided his best estimate of the kind of deterioration that may have happened to the 81 Trucks since September 9, 2013, but failed to identify any particular damage to any of the Trucks.

26

Specifically, Mr. Kovatch speculated that the batteries may be "flat," or dead, and "unlikely to recharge" (Kovatch Test., Tr., Dec. 17, 2013, at 97. But Ms. Wallis testified that Livernois recently moved about 30 of the Trucks and they all started (Wallis Test., Tr., Dec. 18, 2013, at 124). Mr. Kovatch also testified that oil may have drained out of the top of the engines and that starting the engines without oil in the top end of the engine "*might* cause serious engine damage." *Id.* (Kovatch Test., Tr., Dec. 17, 2013, at 100) (emphasis added). But no evidence was adduced to show that this has actually occurred. Mr. Kovatch also testified that tires can develop "flat spots" if not moved, but Plaintiffs presented no evidence concerning how frequently, or infrequently, the Trucks have been moved – much less that the tires actually have "flat spots" (Kovatch Test., Tr., Dec. 17, 2013, at 98-99). Furthermore, Mr. Kovatch testified that "flat spots" in tires "can be cured by driving the vehicle." *Id.*

Based on the evidence adduced at trial, Plaintiffs have presented sufficient proof to suggest that the Trucks *may have* suffered some damages as a direct consequence of having been detained by Livernois from September 9, 2013, to the present. A plaintiff must prove damages with reasonable certainty; speculative damages, or those based on conjecture, are not generally recoverable. *See Ensink v. Mecosta Co. Gen. Hosp.*, 687 N.W.2d 143 (Mich. App. 2004). On the record before the Court, the evidence does not prove with reasonable certainty that Livernois's detention of the Trucks caused them any physical damage.

27

However, the Court finds that the evidence raises enough of a question concerning whether the detention caused damages to the Trucks that Plaintiffs should be entitled to submit a claim for damages after a complete inspection of the Trucks has been conducted, and the results of such inspection have been provided to the Court.  If Plaintiffs intend to submit such a claim, they must comply with the following procedures:  (1) the inspection must be conducted jointly and simultaneously by inspectors selected by VDC and Livernois; (2) the damages shall be limited to those caused by Livernois's detention of the Trucks from September 9, 2013, to the present; (3) the joint inspection must be completed within 10 days of the date of this Order, and any claim for damages submitted to the Court within 30 days of the date of this Order.  A penalty bond was posted in this matter (Dkt. 49) in order to cover physical damages to the Trucks occurring since September 9, 2013.  If Plaintiffs submit a claim for damages related to the physical deterioration of the Trucks, the parties are directed to brief the question of how such damages are to be assessed and, in particular, whether such damages are recoverable against the bond.

Plaintiffs have also argued that the Contract permits them to recover liquidated damages in the amount of $15 per day, per Truck, for failure to meet the production time-lines contained in the Contract (P's Trial Ex. 3, Contract ¶ 4.5, 8.1). This category of damages is more properly awarded in an action sounding in breach of contract for failure to meet the production schedule.  The liquidated damage amount is meant to cover delays caused by non-performance, rather than delays

caused by a bank's assertion of a colorable legal claim to a security interest in the Trucks as collateral.  Plaintiffs did not sue Livernois for breach of contract, but rather only brought a single count for claim and delivery, therefore the Court finds that VDC is not entitled to an award of liquidated damages against Livernois in this lawsuit.

Plaintiffs also seek to recover damages for the value of lost or destroyed Property that had been in the possession of Livernois and subject to the terms of the Contract.  Plaintiffs established that certain specific items of the Property were not returned, and the replacement cost for the missing Property is $24,200.97.  Plaintiffs are therefore entitled to recover that amount from Livernois[11] (P's Trial Ex. 47; Kovatch Test., Tr., December 17, 2013, at 92:13-25, 93:1-9).  The Court will issue a final judgment in this matter, after any claim for physical damages to the Trucks during their detention by Livernois is resolved.

## **CONCLUSION**

Based on the findings of fact and conclusions of law set forth above, the Court rules that:  (a) VDC, as assignee and attorney in fact for VAL, is entitled to immediate possession of all 81 Trucks; (b) the Trucks are worth $1.6 million; (c) the outstanding debt owed by Livernois, NoToDa, and NTD to Comerica was, at the

---

[11] Plaintiffs are not entitled to collect any monetary damages against Comerica.  First, Plaintiffs did not plead a claim against Comerica.  Second, it does not appear that Plaintiffs have a valid claim and delivery action against Comerica.  Claim and delivery is a possessory action that can be brought only against a defendant in possession of the property at the time demand for return of the property is made, or at the time the suit is commenced.  *See Bellows v. Goodfellow*, 267 N.W. 885 (Mich. 1936).  Plaintiffs never demanded the Trucks from Comerica, and Comerica has never possessed them.  During the entire course of this litigation, the Trucks remained in Livernois's possession.

time of trial, $3,134,611.20; and (d) VDC is entitled to monetary damages from

Livernois in the amount of $24,200.97, representing the value of the lost Property.

Should Plaintiffs submit a claim for physical damages to the Trucks caused by their

detention, the Court will decide that claim after considering the positions of the

parties.

SO ORDERED.

s/Terrence G. Berg
TERRENCE G. BERG
UNITED STATES DISTRICT JUDGE

Dated:  February 3, 2014

## Certificate of Service

I hereby certify that this Order was electronically submitted on February 3,

2014, using the CM/ECF system, which will send notification to each party.

By:  s/A. Chubb
Case Manager